## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**THOMAS MATHENY,**

                Plaintiff,

   vs.

**E.I. DU PONT DE NEMOURS AND COMPANY** and **THE CHEMOURS COMPANY,**

             Defendants.

CIVIL ACTION NO. <u> 2:22-cv-320       </u>

### COMPLAINT AND JURY DEMAND

Plaintiff Thomas Matheny, by and through his attorneys, **FITZSIMMONS LAW FIRM PLLC** and **FARRELL & FULLER**, **LLC**, upon information and belief, states and alleges as follows for his Complaint against Defendant E. I. du Pont de Nemours and Company (hereinafter "DuPont" and Defendant The Chemours Company (hereinafter "Chemours") (collectively hereinafter "Defendant" or "Defendants"):

### NATURE OF THE CASE

1.     This action is brought on behalf of Plaintiff, Thomas, who was injured by Defendants DuPont and Chemours as a result of their intentional, malicious, knowing, reckless and/or negligent acts and/or omissions in connection with contamination of human drinking water supplies used and consumed by Plaintiff Thomas Matheny.

2.     At all relevant times, Defendants owned, operated, maintained, managed and/or otherwise controlled a manufacturing facility in Wood County, West Virginia, known as the "Washington Works Plant" (hereinafter referred to as the "Plant").

3.     As a result of Defendants' negligent, improper, inadequate, inappropriate and/or otherwise unlawful conduct in their ownership, operation, maintenance, management and/or control of the Plant, Plaintiff has suffered injuries for which he seeks redress and damages.

4.     Consequently, Plaintiff Thomas Matheny seeks compensatory and punitive damages, costs incurred and to be incurred by Plaintiff, and any other damages that the Court or jury may deem appropriate, as a result of Defendants' conduct, which has caused Plaintiff Thomas Matheny to suffer from conditions including, but not limited to, testicular cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are of diverse citizenship and the amount in controversy, exclusive of interest and costs, well exceeds $75,000.00.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events giving rise to Plaintiff Thomas Matheny's claims occurred in this District, Defendants transacted business in this district, and the tortious conduct at issue in this case occurred in this District.

7.     At all times material herein, Defendants maintained systematic, regular, and continuous contacts in the State of West Virginia; regularly transacted business within the State of West Virginia; and regularly availed itself of the benefits of this State. Additionally, Defendants' acts and/or omissions which give rise to Plaintiff's injuries and damages were substantially

conducted within the State of West Virginia and have caused tortious injury to Plaintiff as well as thousands of other West Virginia residents and citizens.

## **PARTY PLAINTIFF**

8.  Plaintiff Thomas Matheny is a resident of the State of West Virginia with an address of 403 Plummer Drive, Leon, West Virginia, 25123 (Mason County).

9.  Upon information and belief, Thomas Matheny is a *Leach* class member who resided and/or worked in at least one of the contaminated water districts including, but not limited to, the Mason County Public Service water district starting in, about, or before 1989 to 2007 and on or about 2016 to the present and consumed water contaminated with C-8 at greater than .05 ppb for at least one year.

10.  As result of Defendants' acts and/or omissions as described herein, Plaintiff Thomas Matheny, was diagnosed with testicular cancer on August 20, 2020, and was caused to sustain severe and permanent personal injuries, pain, suffering, and emotional distress, including but not limited to:

(a)  Severe and permanently disabling personal injuries as well as psychological injuries;

(b)  Medical bills in an amount presently undetermined and future medical bills;

(c)  Lost wages and benefits in an amount presently undetermined;

(d)  Loss of future earnings, wages, capacity and benefits;

(e)  Lost household services and future lost household services;

(f)  Extreme physical pain and suffering, past and future;

(g)  Extreme mental anguish and suffering, past and future;

(h)  Loss of capacity to enjoy life and engage in normal activities, past and future;

(i)     Annoyance and inconvenience, humiliation, embarrassment, and aggravation, past and future;

(j)     Reduced life expectancy, extreme anxiousness, and fear of death; and

(k)     All other damages permitted by applicable law.

11.     The injuries and damages sustained by Plaintiff Thomas Matheny were caused by Defendants' acts and/or omissions.

12.     To the extent that Defendants claims that one or more of Plaintiff's claims are barred by any applicable statute of limitations, Plaintiff asserts that the statute of limitations is and has been tolled by Plaintiff's discovery that his injuries were caused by Defendants' actions/inactions, all as more fully set forth in this Complaint, after the injury sustained by Plaintiff. Further, Plaintiff asserts that the statute of limitations is and has been tolled as a result of the class action procedures/settlement and the continuing nature of the trespass and harm described herein.

## PARTY DEFENDANTS

13.     Upon information and belief, Defendant E.I. DU PONT DE NEMOURS AND COMPANY (hereinafter referred to as "Defendant" or "DuPont") is a Delaware corporation, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19898. DuPont's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

14.     DuPont owned and operated a manufacturing facility in Wood County, West Virginia known as the "Washington Works Plant" until at least 2015.  At all times thereto, DuPont was in control of the Washington Works Plant, the activities conducted at the facility, and all chemicals and/or emissions which were used and/or released from the facility.

15.     The Chemours Company (hereinafter collectively referred to, along with DuPont, as "Defendant" or "Defendants") is a Delaware corporation and has a principal place of business at 1007

Market Street, Wilmington, Delaware 19898 with a registered agent for service at: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

16.     Chemours is a chemical company that was founded in July 2015 as a spin-off from DuPont and maintained control of DuPont's performance chemical divisions, including operations of the Washington Works Plant. At all times prior to this spin-off event, all operating elements of Chemours were bound by the covenants of the *Leach* class settlement agreement and at no point did DuPont, *Leach* class counsel, or any Court absolve the operating units held within Chemours from their inclusion in, and control by, the covenants of the *Leach* class settlement agreement. On or about February 13, 2017, Chemours and DuPont jointly announced that Chemours would annually pay the first $25 million of any potential future PFOA costs (after 2017) through at least 2022. If that amount is exceeded, DuPont will pay any additional amount up to $25 million, annually. These costs would include those C8 liabilities related to the present lawsuit.

17.     As used and referred to in this Complaint, any and all references to DuPont, Chemours, Defendant, and/or Defendants, individually or collectively, includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, and organizational units of any kind, their predecessors, successors, and assigns, and their present officers, directors, employees, agents, representatives, and any other person(s) acting on their behalf.

18.     At all times material hereto, Defendants each maintained systematic and continuous contacts in the states of West Virginia and Ohio, regularly transacted business within this state, and regularly availed itself of the benefits of this state.  Additionally, Defendants' collective and independent acts and/or omissions, as described herein, were substantially conducted within the states of West Virginia and Ohio and have caused tortious injury to Plaintiff as well as thousands of other West Virginia and Ohio residents and citizens.

19.     Upon information and belief, Defendants have derived substantial revenue from goods and products used in the State of West Virginia.

20.     Upon information and belief, Defendants expected or should have expected their acts to have consequences within the State of West Virginia, and derived substantial revenue from interstate commerce within the United States and the State of West Virginia, more particularly.

## FACTUAL ALLEGATIONS

21.     Since the early 1950's, in connection with its manufacturing operations, Defendants have used at the Plant one or more materials that contain, incorporate, include and/or degrade into perfluorooctanoic acid (hereinafter referred to as "PFOA") and/or ammonium perfluorooctanoate (a/k/a C-8/APFO/PFOA) (hereinafter referred to as "C-8").

22.     During the course of its operations at the Plant, Defendants have negligently, recklessly, maliciously, knowingly, carelessly, wrongfully and/or intentionally allowed, caused, and/or otherwise permitted and is continuing to so allow, cause and/or otherwise permit C-8 to be discharged, vented, emitted and/or otherwise released from the Plant into the environment at, under and/or surrounding the Plant, including into air, soil, sediment and water, in such a manner as to result in C-8 contamination of human drinking water supplies (hereinafter referred to as the "Releases").

23.     Since the construction of its manufacturing operations at the Plant, Defendants have been aware that one or more operations and equipment used at the Plant involving C-8 would allow and/or permit Releases. Despite such knowledge, Defendants negligently, recklessly, maliciously, knowingly, carelessly, wrongfully and/or intentionally conducted such operations and/or used such equipment with the understanding and/or expectation that such Releases would and/or could occur, and/or were likely to occur, without additional control and/or abatement equipment in place.

24.     By at least 1954, concerns about the potential toxicity of C-8 had been raised internally, which led DuPont's own researchers to conclude by at least 1961 that C-8 was toxic and, according to Defendants' own Toxicology Section Chief, should be "handled with extreme care."

25.     By 1976, DuPont was aware of reports from researchers finding organic fluorine in samples of human blood from blood banks in the United States, which such researchers believed to be a potential result of C-8 exposure.

26.     By 1978, the 3M Company (hereinafter referred to as "3M"), DuPont's C-8 supplier at the time, informed DuPont's Medical Director that 3M had collected blood samples from its workers who had been exposed to C-8 and that such samples contained organic fluorine.

27.     In 1978, DuPont's Medical Director authorized a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to that C-8 exposure. Such monitoring would include obtaining blood samples from those workers and analyzing them for the presence of organic fluorine content.

28.     In 1978, DuPont's Medical Director authored and published an article that acknowledged DuPont's duty to report potential health hazards related to the materials it handles at its manufacturing facilities (hereinafter referred to as the "1978 Article"). Specifically, DuPont's Medical Director acknowledged that DuPont had and has a "duty to report health hazards" and therefore "should disclose health-hazard information," and that to "lay all the facts on the table" is "the only responsible and ethical way to go," as "[t]o do less would be … morally irresponsible."

29.     In sworn deposition testimony in 2004, DuPont's former Medical Director acknowledged that DuPont's duty to report potential health hazards from materials it uses at its Plant, as previously described in the 1978 Article, extends to the communities in which

Defendant's plants are located.

30.     By March 1979, DuPont was in possession of data suggesting that its workers exposed to C-8 had a significantly higher incidence of various adverse health problems as compared to unexposed workers. Specifically, the number of abnormal liver function tests in C-8 exposed workers was markedly higher than in unexposed workers.

31.     Despite this knowledge, in 1979, DuPont failed to report the above-detailed results, or the results of its health status analysis in comparison to unexposed workers, to any government agency or community near any of its manufacturing facilities handling C-8.

32.     By 1980, DuPont had confirmed internally that C-8 "is toxic," that "people accumulate C-8", and "continued exposure is not tolerable."

33.     In 1981, DuPont was in possession of information indicating reports from 3M of birth defects in the eyes of baby laboratory rats who were exposed to C-8.

34.     In 1981, in response to those findings of eye defects, DuPont prepared and implemented an internal study of its own female employees at the Plant exposed to C-8 to determine if any similar eye or facial defects had occurred among their children (hereinafter referred to as the "1981 Plant Pregnancy Study"). The study's purpose was specifically to determine if "[p]regnancy outcome among female Washington Works employees is causally related to their occupational exposure to C-8," as noted by Defendant in its own study protocol.

35.     Furthermore, in its 1981 Pregnancy Study, DuPont specifically noted that finding "2 malformations in 10 exposed live births is a significantly higher rate than a national rate … [and] is also significantly higher than a plant rate," and would be considered a "statistically significant excess" of such birth defects.

36.     After instituting the protocol for the 1981 Pregnancy Study, DuPont collected information, including blood results and umbilical cord blood, from female Plant employees and their babies. The Plant doctor also conducted interviews of those employees. This information collectively revealed that of seven babies born to female Plant employees exposed to C-8 through manufacturing operations at the Plant, two were born with defects in their eye and/or facial area, and also had significantly elevated levels of C-8 in their blood. Therefore, these results demonstrated the ability of C-8 to cross the placenta from an exposed mother to her child in gestation.

37.     After learning of these results indicating a "statistically significant excess" of such defects as defined by DuPont's own 1981 Pregnancy Study protocol, which was specifically designed by DuPont to assess the causal connection between C-8 exposure and such harm, DuPont intentionally and purposefully chose not to finalize, publish and/or otherwise release and/or disclose the results of that study to anyone outside of DuPont's own operations.

38.     In addition, by the end of 1981, DuPont was aware that C-8 was likely being released from the Plant into the surrounding air, and that such C-8 air emissions were likely leaving the boundaries of the Plant itself.

39.     In March 1982, DuPont reported to the United States Environmental Protection Agency (hereinafter referred to as the "USEPA") that further internal analysis conducted by both 3M and DuPont suggested that eye defects observed in baby rats exposed to C-8 had no causal link to C-8 exposure. Importantly, at that time DuPont failed to disclose or report to USEPA, or the general public, regarding any of the "causal" results in DuPont's investigation of the human babies born to C-8 exposed mothers.

40.     In November 1982, DuPont's Medical Director noted that DuPont did not have

adequate "knowledge of the chronic health effects from long-term exposure to low levels of" C-8, that C-8 "is retained in the blood for a long time," that there "is obviously great potential for current or future exposure of members of the local community from emissions" from the Plant, and recommended that all "available practical steps be taken to reduce this exposure."

41.    In 1984, several male workers at the Plant, who had been exposed to C-8 at that point for a few years, complained that their wives were having difficulty conceiving children. Despite this report, DuPont did not investigate the claim.

42.    By 1984, DuPont began a program through which it secretly collected samples of tap water reportedly sourced from public drinking water supplies located near the Plant. DuPont conducted this program by asking Plant employees to collect the samples from local businesses and/or their own homes. DuPont then internally analyzed these samples in order to assess the level of C-8 content.

43.    By 1984, DuPont developed a methodology for analyzing water samples to assess C-8 content with a detection limit of 0.6 parts per billion (hereinafter referred to as "ppb") or 600 parts per trillion (hereinafter referred to as "ppt").

44.    In 1984, DuPont's internal analyses of the above-described samples collected near the Plant indicated that C-8 was present in the public water sources of locations in both Ohio (specifically, from the Little Hocking Water Association (hereinafter referred to as "LHWA")) and West Virginia.

45.    In 1984, DuPont was aware that the well field for the impacted LHWA public water supply was located upstream from any effluent discharged to the Ohio River from the Plant; however, it was located in the prevailing wind direction from the Plant.

46.    In 1984, after obtaining the above-detailed data, DuPont held a meeting at its

10

corporate headquarters in Wilmington, Delaware, to discuss issues surrounding C-8 (hereinafter referred to as the "1984 Meeting").

47.     During the 1984 Meeting, DuPont employees in attendance discussed the existence of technologies that could further control C-8 emissions from its manufacturing sites, and potential replacement materials that could eliminate any further C-8 emissions from its manufacturing operations.

48.     During the 1984 Meeting, DuPont employees in attendance described the C-8 issue as "one of corporate image, and corporate liability. Liability was further defined as the "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation."

49.     During the 1984 Meeting, DuPont employees in attendance stated that "legal and medical will likely take the position of total elimination" of C-8.

50.     During the 1984 Meeting, DuPont employees in attendance noted that options to eliminate further use or emissions of C-8 at Defendant's manufacturing facilities were not "economically attractive," and decided not only to keep using C-8 but to increase its use at the Plant.

51.     At that time, DuPont did not want to discontinue its use of C-8, despite its risks, because such action would have jeopardized approximately $100-$200 million in annual business.

52.     After the 1984 Meeting, DuPont collected additional water samples from public water sources in the area of the Plant at several points in time between 1984 and 1991, and subsequently analyzed the C-8 content of those samples (hereinafter referred to as the "Additional Water Samples").

53.     During each of such sampling events, the Additional Water Samples indicated to

DuPont the presence of C-8 in the water of at least one public water supply located near the Plant, including the Lubeck Public Service District (hereinafter referred to as "LPSD"), whose public water supply wells were, at the time, located adjacent to the Plant along the Ohio River, and more importantly, downstream from the Plant's ongoing releases of C-8 into that river.

54.     By at least 1988, DuPont was aware that at least one toxicity study in laboratory rats revealed a relationship between C-8 exposure and increased rates of certain types of cancer, including testicular cancer.

55.     Despite Defendant's knowledge of C-8's potential toxicity and carcinogenicity, DuPont continued throughout the rest of the 1980s and into at least the early 2000s to increase its use of C-8 at the Plant and to increase the amount of C-8 wastes it discharged from the Plant directly into the air, the Ohio River, and unlined non-hazardous waste landfills in the vicinity of the Plant and local drinking water wells, all of which DuPont knew would result in the continuing and increasing release of C-8 into the underlying water table and nearby surface waters.

56.     Rather than disclose to the LPSD or any of its customers that elevated levels of C-8 had been detected in the LPSD public water supply, DuPont arranged to purchase the LPSD well-field property so it would become part of the Plant site. Further, in 1989 DuPont facilitated LPSD's relocation several miles further away from the Plant.

57.     After relocating the LPSD, DuPont notified its employees to immediately cease all further sampling of the former LPSD wells and to destroy all those samples previously-drawn yet unanalyzed.

58.     By April of 1990, Defendant's own sampling data had confirmed that part per million (hereinafter referred to as "ppm") levels of C-8 were present in the water of the Dry Run Stream into which leachate flowed from the Defendant-owned, and unlined, Dry Run Landfill in

Wood County, West Virginia, where DuPont had purposefully dumped more than 7,000 tons of C-8-contaminated sludge originating from the Plant.

59.     Despite Defendant's knowledge of the potential toxicity of C-8, including the confirmed carcinogenic nature of C-8 to animals, DuPont knowingly, intentionally and purposefully withheld information about the high level of C-8 in the Dry Run Stream from the family living next to the Dry Run Landfill who DuPont knew had hundreds of head of cattle drinking from and wallowing in that stream.

60.     In 1991, DuPont adopted an internal Community Exposure Guideline (hereinafter referred to as "CEG") for C-8 in community drinking water of 1 part per billion.

61.     Beginning later in 1991, water samples were analyzed by and/or on behalf of DuPont at its own Experimental Station Laboratory from public water supplies in the vicinity of the Plant. These analyses indicated levels of C-8 well-above 1 ppb, with the highest levels (as high as 3.9 ppb) being found in water from the new LPSD well field, now located several miles further away from the Plant.

62.     After finding levels of C-8 in public water supplies near the Plant that were more than double or triple the CEG developed by DuPont as an internal community exposure safety guideline, DuPont prepared information to disclose such facts to the residents drinking such contaminated water. However, DuPont then purposefully and intentionally chose not to release and/or otherwise disclose that information to anyone outside the company.

63.     Rather than alert the community to the C-8 contaminated water, in November 1991 DuPont switched to an outside laboratory for the purpose of analyzing water samples for C-8 content in an attempt to generate data that would reflect lower C-8 sample results. Notably, that laboratory claimed to be able to detect C-8 in water as low as 0.1 ppb (100 ppt) (the "New Water

Method").

64.    When DuPont switched to the New Water Method, that laboratory informed DuPont that the New Water Method had surrogate recovery rates that resulted in C-8 results that reported only approximately 60% of the C-8 actually present in the water. As such, the reported C-8 sample results derived using the New Water Method would need to be corrected to account for the low surrogate recovery rate and to prevent the misleading results from creating the mistaken belief that the C-8 levels in the water were significantly lower than in reality.

65.    Despite being warned that data generated by the new C-8 water analysis methodology would suggest C-8 levels that were significantly lower than the level of C-8 likely present in the water, and that such data must be clarified and/or corrected to avoid being misleadingly inaccurate, DuPont negligently, recklessly, maliciously, knowingly, carelessly, wrongfully and/or intentionally failed to make such corrections and/or clarifications when it eventually revealed such data to third parties, including public water suppliers, their customers and/or governmental entities.

66.    In August 2003, DuPont co-authored a report with USEPA and the West Virginia Department of Environmental Protection (hereinafter referred to as "WVDEP") confirming that air emissions from the Plant were indeed a source of C-8 found in public water supplies near the Plant, noting specifically that "[a]ir emissions of C-8 from the Washington Works Facility are believed to be the source of C-8 detected in areas of West Virginia located adjacent to the facility and the Local Landfill" and that "[a]ir emissions of C-8 from the [P]lant are believed to be the source for C-8 along the Ohio River upstream of the [P]lant."

67.    Defendant's own outside consultants also confirmed in published, peer-reviewed

literature that "particulate deposition from [the Plant] air emissions to soil and the subsequent transfer of the chemical through the soil was determined to be the most likely source of [C-8] that was detected in groundwater at locations off-site" from the Plant.

68.     In 1993, a published peer-reviewed study of 3M workers exposed to C-8 at a 3M manufacturing facility in Minnesota reported that "ten years of employment in exposed jobs was associated with a 3.3 fold increase … in prostate cancer mortality compared to no employment in [C-8] production. … If prostate cancer mortality is related to [C-8, C-8] may increase prostate cancer mortality by altering reproductive hormones in male workers," thus making clear to DuPont by at least 1993 that C-8 was linked to increased cancer rates in C-8-exposed humans.

69.     Throughout the rest of the 1990s, Defendant's own corporate epidemiologists internally tracked the number of cancer cases among Plant employees (while DuPont continued to collect C-8 blood samples from such employees), repeatedly noting increased levels of various forms of cancer, including prostate and kidney cancer. However, despite possessing this knowledge, DuPont intentionally and purposefully chose not to publish or otherwise disclose any of those C-8 blood level or cancer results to anyone outside the company.

70.     In 1998, members of a family whose cattle were drinking C-8-contaminated water, unbeknownst to their owners, from the Dry Run Creek sued DuPont in a lawsuit brought in West Virginia federal court, before Judge Joseph R. Goodwin, styled *Tennant, et al., v. E.I. du Pont de Nemours & Co., Inc.*, Civil Action No. 6:99-0488 (S.D. W. Va.) (hereinafter referred to as the "*Tennant* Case"), after DuPont refused to provide any explanation or remedy for the deaths of hundreds of head of the family's cattle and the Tennant family's own developing health problems after exposure to materials in the Dry Run Creek and Landfill.

71.     In 1999, after the Tennant family began pushing DuPont to disclose more detailed

information about the identity of the chemicals and materials dumped into the Dry Run Landfill that might be causing the problems with their cattle and the family's health, DuPont received data from a laboratory study funded, in part, by DuPont and 3M to assess effects of C-8 exposure on primates confirming that two of twenty-two monkeys had died, including one monkey who had received the lowest dose of C-8 in the study.

72.     Based on the recent monkey study results, DuPont became increasingly concerned about any revelation of C-8 contamination in the community through discovery in the *Tennant* Case, and orchestrated a plan to persuade the Tennant family that all of the problems alleged by the Tennants were all the family's own doing, setting up a team of scientists from both DuPont and USEPA, known as the "Cattle Team," whose purpose would be to review all of the relevant data and "scientifically" determine whether the problems with the health of the cattle were associated with anything at the Dry Run Landfill.

73.     Although DuPont knew, but had not disclosed, at the time that massive amounts of C-8 were present in the Dry Run Landfill and the Dry Run Stream, which the Tennants' cattle were consuming, at levels more than 100 times Defendant's own 1 ppb safety guideline for human consumption, and had appointed to the Cattle Team at least one long-time DuPont scientist and veterinarian who was well aware of C-8 and its potential toxicities, DuPont never disclosed or mentioned to any of the USEPA members of the Cattle Team that C-8 might be a contaminant of interest.

74.     Thereby, DuPont purposefully and intentionally allowed and encouraged the Cattle Team to perform its "scientific" investigation without ever considering C-8 and without taking any samples or collecting and preserving any data regarding the potential impact of C-8 on the cattle. Defendant's acts and/or omissions then resulted in the generation of a final Cattle Team report in

December of 1999 that did not identify any chemical-related problems and essentially blamed all of the problems on the Tennant family's own herd management practices.

75.     By at least May 2000, DuPont learned that 3M had decided to stop manufacturing and selling C-8 based upon concerns associated with the bio-persistence and toxicity of C-8.

76.     Despite knowledge of the same, and the confirmed fact that C-8 was in public and private drinking water supplies in the vicinity of the Plant, Defendant's top corporate management met in 2000 and made the purposeful, intentional, willful, reckless, wanton and knowing decision not to stop using C-8 or releasing C-8 into the environment. Furthermore, that same corporate management team later authorized, approved and commenced direct manufacture of its own C-8 at a Defendant-owned plant in North Carolina.

77.     By at least June 9, 2000, DuPont was aware that C-8 had been designated by the American Council of Governmental and Industrial Hygienists (hereinafter referred to as "ACGIH") as an A3 "confirmed animal carcinogen."

78.     In the late summer of 2000, as the *Tennant* Case was progressing toward trial, a single document was discovered in the massive amount of documents produced by DuPont in discovery that referenced the presence of something called "C8" in the Dry Run Landfill.

79.     Because DuPont had previously restricted the information it provided in discovery during the *Tennant* Case to materials that were regulated or listed wastes under federal or state laws and regulations, and as C-8 was not so regulated or listed at the time, DuPont was asked to immediately produce all documents relating to C-8, which request DuPont aggressively opposed.

80.     After the federal court in the *Tennant* Case finally ordered DuPont to produce all of its C-8 documents, plaintiffs began to uncover much of the information detailed above. Specifically, plaintiffs discovered that DuPont knew and had failed to disclose that not only had

C-8 been present in the Dry Run Landfill and Dry Run Creek for years, but numerous internal documents indicated that C-8 also had been (and presumably still was) present in area drinking water supplies, and that internal health and safety studies suggested risks to human health from C-8 exposure.

81.     By the fall of 2000, DuPont understood that the Tennants were now aware of the C-8 contamination at the Dry Run Landfill, in the Dry Run Creek, and in area public water supplies, and that DuPont had been withholding and concealing that information.

82.     In November 2000, one of Defendant's in-house counsel responsible for C-8 issues wrote the following to his co-counsel: "I think we need to make more of an effort to get the business to look into what we can do to get the [impacted West Virginia] community a clean source of water to filter the C-8 out of the water. … We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. … Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

83.     One of Defendant's other in-house counsel responsible for C-8 issues (and Defendant's defense of the *Tennant* Case) also wrote: "The sh[..] is about to hit the fan in WV, the lawyer for the farmer finally realizes the surfactant [C-8] issue …. F[..]k him. Finally the plant realizes it must get public first, something I have been urging for over a year."

84.     Soon thereafter, DuPont authorized its attorneys to seek a gag order from Judge Goodwin in the *Tennant* Case to try to stop one of the Tennants' attorneys involved with uncovering the C-8 drinking water contamination, specifically Robert Bilott with Taft, Stettinius

& Hollister, LLP, in Cincinnati, Ohio, from publicly disclosing or addressing the issue with any federal and state environmental protection agencies. Judge Goodwin denied Defendant's request, allowing the information to belatedly become public.

85.    In response to the federal court's refusal to issue the requested gag order, Defendant's in-house counsel for C-8 issues wrote: "Court yesterday did not agree to shut up plaintiff lawyer in our Parkersburg situation and today he testifies [sic] an EPA hearing. … I told the clients to settle many moons ago. Too bad they still are in denial and don't think things can get worse, wrong again."

86.    On April 8, 2001, Defendant's in-house on C-8 issues described Defendant's C-8 as a material that "we poop to the river and into drinking water along the Ohio River."

87.    On June 14, 2001, Defendant's in-house counsel on C-8 issues wrote that "the environmental agencies very concerned about what to say when asked if the stuff we are putting into drinking water is 'safe.' We say it is, but are viewed as an interested party (rightly)."

88.    On September 1, 2001, soon after the *Tennant* Case had settled and a new class action lawsuit had been filed in West Virginia state court against DuPont arising from C-8 contamination of drinking water supplies near the Plant, styled *Leach, et al. v E.I. du Pont de Nemours and Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (hereinafter referred to as the "*Leach* Case"), Defendant's in-house counsel on C-8 issues wrote: "I can't blame people if they don't want to drink our chemicals. The compound … is very persistent in the environment, and on top of that, loves to travel in water and if ingested or breathed wants to stay in the blood, the body thinks it is food, so pulls it from the intestine, the liver then dumps it back to the stomach because it can't break it down, then the intestines puts it right back into the blood."

89.    On October 12, 2001, Defendant's in-house counsel on C-8 issues wrote in

connection with C-8 drinking water contamination: "A debacle at best, the business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with Defendant."

90.     On October 13, 2001, Defendant's in-house counsel on C-8 issues wrote with respect to C-8 contamination near the Plant: "[W]e are exceeding the levels we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate. …I have been telling the business to get out all the bad news, it is nice to see that we are now consulting with lawyers … that … are advising the same strategy. Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless, don't they read the paper or go to the movies?"

91.     On October 20, 2001, after analysis of certain water samples from the LPSD indicated C-8 levels less than 1 ppb, Defendant's in-house counsel on C-8 issues wrote: "Now if the clients will only listen to us on doing free testing and giving away bottled water we might avoid punitive damages."

92.     On January 12, 2002, after test results indicated levels of C-8 as high as 7 ppb in water from the LHWA in Ohio, Defendant's in-house counsel on C-8 issues wrote that "in addition to all the agencies we have had on our butts, we now have Ohio and another EPA Region, not to mention the 20,000 people who drink the water supplied by Little Hocking with our surfactant in it, likely it has been there for at least the last decade."

93.     On February 9, 2002, Defendant's in-house counsel on C-8 issues wrote with respect to C-8 contamination: "We should have checked this out long ago, but now our only choice is to share whatever we learn and trying to fix things, best current theory is air deposition from our

stacks."

94.     Between late 2001 and 2003, DuPont orchestrated, coordinated, and participated in creative, misleading efforts designed and intended by DuPont to generate a new federal-and/or state-"approved" "screening level" for C-8 in drinking water supplies through creation of a "C-8 Assessment of Toxicity Team" (a/k/a "CAT Team"). That "screening level" would be significantly higher than Defendant's own 1 ppb CEG and would be held out by DuPont to the public, including Plaintiff, as proving the lack of any health risk or safety concerns with respect to the level of C-8 in drinking water supplies near the Plant.

95.     After the CAT Team announced in the Spring of 2002 a new "screening level" for C-8 in drinking water of 150 ppb – 150 times higher than the 1 ppb CEG DuPont still uses to this day – DuPont actively and repeatedly cited that screening level in communications intended for dissemination to the public, including Plaintiff, and indicated that such screening level proved that the levels of C-8 in drinking water near the Plant were all perfectly "safe" and posed no risk of harm or injury to anyone.

96.     In March of 2002, the Director of Defendant's Haskell Laboratory for Health & Environmental Sciences falsely and misleadingly represented to a Charleston, West Virginia newspaper in a letter intended for dissemination to the public, including Plaintiff, that there is "an extensive database on C-8 …that indicate no known adverse human health impact associated with current or historic use of C-8," "there are no known adverse health effects associated with C-8 in humans or the environment," that "[a]ll of this information has been provided to both state and federal regulators," and that "the importance of communicating accurate information in its proper context – especially in areas as complex as human and environmental health – should be of the

21

highest priority in serving the public interest."

97.     In May of 2002, the Plant's Plant Manager falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff, that "the presence of C-8 at the low levels detected to-date in drinking water in the Mid-Ohio Valley is not harmful."

98.     During the *Leach* Case class action litigation against DuPont involving the contaminated drinking water supplies near the Plant, the West Virginia state court overseeing that litigation found that documents relating to how the screening level had been developed and Defendant's involvement with those activities had been wrongfully withheld and destroyed.

99.     The *Leach* Case court also found that Defendant's lead C-8 toxicologist and representative on the CAT Team had inappropriately and wrongfully destroyed C-8 documents, and that DuPont should be sanctioned for its discovery abuses and attempts to delay and withhold production of C-8 documents in that case.

100.    Beginning by at least 2003, DuPont paid various consultants, including The Weinberg Group, many thousands of dollars to implement a comprehensive strategy purposefully designed to attack and discredit those who alleged adverse health effects from C-8, to prevent third parties from "connecting the dots" between DuPont and C-8 problems, to coordinate media and third-party communications, and to thwart any C-8-related litigation. DuPont later modified that strategy into its "Clean Hardball" plan, which later became the subject of a Congressional investigation.

101.    In February of 2003, the Plant's Plant Manager falsely and misleadingly represented in various statements provided to various media representatives, including a Columbus, Ohio, newspaper, which were intended for public dissemination, including to Plaintiff, that, "[i]n more than 50 years of C-8 use by DuPont and others, there have been no known adverse

human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to C8," that "DuPont has made significant efforts to respond to the public honestly and openly with correct information about C8, and that "the use of C8 at the Washington Works site has not posed a risk to either human health or the environment."

102.    During a "media update" provided by DuPont in March 2003, various representatives of Defendant, including the Plant Manager and the Director of Defendant's Haskell Laboratory for Health and Environmental Sciences, falsely and misleading represented through documents and statements intended for dissemination to the public, including Plaintiff, that "there are no health effects associated with C-8 exposure," that "C-8 is not a human health issue," that "in more than 50 years of C8 use by DuPont and others, there have been no known adverse human health effects associated with C8," and that DuPont "know[s] for a fact that there have been no observed adverse health effects among 3M and DuPont employees who have worked with C8."

103.    Later in March 2003, Defendant's Vice President and General Manager for DuPont Fluoroproducts, falsely and misleading represented in a press release intended for dissemination to the public, including Plaintiff, that C-8 "has been wrongfully represented as a health risk when, in fact, it has been used safely for more than 50 years with no known adverse effects to human health," that "[t]here is no evidence or data that demonstrates [C-8] causes adverse human health effects," that "the compound is safe for all segments of the population, including women of child-bearing age and young girls," and that "[t]here is extensive scientific data, including worker surveillance data, peer-reviewed toxicology and epidemiology studies, and expert panel reports that support this position."

23

104.    In April of 2003, the Director of Defendant's Haskell Laboratory for Health and Environmental Sciences falsely and misleading represented in a press release intended for dissemination to the public, including Plaintiff, that "[t]here is no evidence or data that demonstrates [C-8] causes adverse human health effects, including developmental or reproductive effects, in any segment of the human population."

105.    In April of 2003, Defendant's Vice President and General Manager for DuPont Fluoroproducts falsely and misleadingly represented in a press release intended for public dissemination, including to Plaintiff, that "our use of [C-8] over the past 50 years has not posed a risk to either human health or the environment."

106.    In April of 2003, Defendant's spokesperson for the Plant falsely and misleadingly represented in a written statement provided to media outlets, including West Virginia public radio, which statement was intended for dissemination to the public, including Plaintiff, that Defendant's "use of [C-8] over the past 50 years has not posed a risk to either human health or the environment" and that "[t]here is no evidence to support a finding that the public or the [Leach Case] class has been subjected to adverse health risks from exposure to [C-8] at the levels observed."

107.    In April 2003, Defendant's CEO falsely and misleadingly represented during a DuPont annual shareholder meeting through statements intended for dissemination to the public, including Plaintiff, that DuPont has "not seen any negative impacts on human health or impact to the environment at the exposure levels that we operate" with respect to Defendant's use of C-8.

108.    In May 2003, DuPont falsely and misleadingly represented in a press release issued by DuPont and intended for dissemination to the public, including Plaintiff, that "there is no scientific evidence to support [the Leach Court's] conclusions that the plaintiffs' claims are

24

warranted. In fact, the scientific data overwhelmingly establishes that C-8 is not a human health hazard," that "[n]othing in Defendant's 50 years of experience with C-8 indicates it is a hazard and nothing in the toxicity testing for C-8 suggests the class members are at any risk whatsoever," and that Class Counsel for the plaintiffs in the Leach Case were creating "unjustifiable health concerns" that are "a disservice to the people of the Mid-Ohio Valley" by suggesting that there are potential health risks from their C-8 exposure.

109.    In written information posted by DuPont in late 2003 on a website created for the Plant under the heading "Quick C-8 Facts," which was intended by DuPont for dissemination to the public, including Plaintiff, DuPont falsely and misleadingly represented that "available epidemiologic studies of workers do not show an increased risk of cancer associated with exposure to C-8."

110.    In May of 2004, Defendant's lead in-house toxicologist for C-8 falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff, that C-8 "is not a human carcinogen and there are no known health effects associated with" C-8 and that recent reports of a new study suggesting an increased rate of cancer among Leach Case class members "are inaccurate and inconsistent with published scientific studies," and represent "an example of unscientific reporting and alarmist media coverage that does a disservice to our employees and the community in which they live."

111.    Later in 2004, EPA filed a complaint against DuPont noting violations of the federal Resource Conservation and Recovery Act (hereinafter referred to as "RCRA") and Toxic Substances Control Act (hereinafter referred to as "TSCA") requirements and statutory duties with respect to Defendant's failure to disclose C-8 toxicity and exposure information to USEPA that it should have disclosed beginning in at least the early 1980s (hereinafter referred to as the "EPA

Action"), adding additional counts through a later complaint relating to Defendant's failure to disclose data earlier produced to DuPont by the Tennants' attorneys indicating that the presence of C-8 in local drinking water supplies resulted in elevated levels of C-8 in the blood of those drinking such water.

112.    In July of 2004, DuPont falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff, that C-8 "is not hazardous to human health" and that media reports to the contrary were a "misinterpretation and misunderstanding" of the facts.

113.    In August of 2004, Defendant's General Counsel falsely and misleadingly represented in a press release created and intended for dissemination to the public, including Plaintiff, that the CAT Team's 150 ppb screening level was "EPA's safety guidance for drinking water." Furthermore, in talking points made available to the public, including Plaintiff, linked directly through that same press release attributed to Defendant's General Counsel, DuPont made the false and misleading representations that "[t]here is no scientific evidence that low levels of exposure to [C-8] cause adverse human health effects in any segment of the population" and that there are "no known adverse health effects or environmental effects" from C-8 exposure.

114.    DuPont eventually settled the EPA Action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects, which USEPA characterized as the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

115.    In January 2005, DuPont falsely and misleadingly represented though a press release intended for dissemination to the public, including Plaintiff, that its own study of Plant workers had confirmed that there are "[t]o date, no human health effects known to be caused by"

C-8, even though the same study showed that Plant workers with higher levels of C-8 exposure had higher levels of cholesterol.

116.   On January 11, 2005, DuPont publicly disclosed that the U.S. Department of Justice's Environmental Crimes Section had served it with a subpoena seeking information on C¬

117.   In July of 2005, DuPont falsely and misleadingly represented in a Media Advisory intended for dissemination to the public, including Plaintiff, that C-8 "exposure does not pose a cancer risk or any health risk to the general public."

118.   In January 2006, DuPont became aware that USEPA's Science Advisory Board had approved the recommendation of its independent PFOA Review Panel that C-8 be classified as a "likely" human carcinogen.

119.   In January 2006, the Director of Defendant's Haskell Laboratory for Health & Environmental Sciences falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff, that "in 50 years of working with [C-8], there is no association of cancer in workers who handle or use" C-8.

120.   In February 2006, Defendant's own Epidemiology Review Board (hereinafter referred to as "ERB") cautioned DuPont to stop its repeated and intentional practice of stating to the public through press releases, website postings and other forms of communication directed to the public that there are no adverse health effects associated with human exposure to C-8, noting that recent scientific developments provide sufficient data to "question the evidential basis of Defendant's public expression asserting that [C-8] does not pose a risk to health."

121.   In October of 2006, in direct opposition and defiance of the ERB's advice, Defendant's Medical Director falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff, upon release of Defendant's internal study of death

rates among its Plant workers due to various causes, including cancer, that "there are no human health effects known to be caused by [C-8]."

122.    In March of 2009, again in direct opposition and defiance of the ERB's advice, DuPont reviewed and approved issuance of a press release by one of its consultants, the Sapphire Group, that DuPont intended to be distributed in a way that Plaintiff and the public would see it and be subsequently misled by it, which boldly proclaims that the C-8 in Plaintiff's water is perfectly "safe."

123.    In light of all the facts detailed above, the following is known about the chemical behavior and properties of C-8.

(a)    C-8 is a bioretentive substance in the sense that it is retained in the blood and/or tissues of living organisms, including humans, exposed to the chemical over time.

(b)    C-8 is a bioaccumulative substance in the sense that the levels of the chemical will build up and/or accumulate to higher levels in the blood and/or tissues of living organisms, including humans, exposed to the chemical over time.

(c)    C-8 is a biopersistent substance in the sense that the chemical will tend to remain present over time in environmental media where it is released and/or comes to be located.

(d)    C-8 is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant and/or contaminant.

(e)    C-8 poses a risk to human health at a concentration of less than 1 ppb in water.

124.    Despite Defendant's knowledge of all the facts and details listed above:

(a)    DuPont continued to emit C-8 into the air from the Plant and into the surrounding environment.

(b)    DuPont continued to release C-8 into the Ohio River and groundwater from the Plant.

(c)    DuPont has not entered into any enforceable agreement that requires it to

discontinue the use, release and/or emission of all C-8 at and/or from the Plant at any time in the future.

125.    Defendants did not seek permission from Plaintiff to put or allow any amount of C¬8 in Plaintiff's drinking water.

126.    Plaintiff did not give Defendants permission to put or allow any amount of C-8 in Plaintiff's drinking water.

127.    Defendants did not seek permission from Plaintiff to put or allow any amount of C¬8 in Plaintiff's blood, serum and/or body.

128.    Plaintiff did not give Defendants permission to put or allow any amount of C-8 in Plaintiff's blood, serum and/or body.

129.    Plaintiff and/or a normal, reasonable person living in Plaintiff's community, is reasonably concerned about and fearful of the C-8 in their groundwater, drinking water and/or blood and/or bodies, and reasonably finds such contamination offensive, unreasonable, annoying and/or intolerable.

130.    At all times relevant hereto, Defendants negligently, willfully, wantonly, recklessly, carelessly, wrongfully and/or intentionally failed to disclose to the individuals using the public and/or private water from the West Virginia and Ohio water supplies where Defendant's sampling activities had revealed C-8 levels, that C-8 was in such water and that the levels of C-8 detected in that water exceeded Defendant's own internal CEG.

131.    At all times relevant hereto, Defendants was aware that its methods for analyzing human drinking water samples for C-8 often had poor surrogate recovery rates and/or other deficiencies, such as absorption to glass, that indicated to Defendants that the actual levels of C-8 in the analyzed water were likely higher than the levels of C-8 reported by such methods. However,

despite that knowledge Defendants negligently, recklessly, carelessly, wrongfully and/or intentionally misrepresented, failed to disclose, and/or purposefully withheld and/or concealed such information from those individuals likely to consume the water.

132.    At all times relevant hereto, Defendants negligently, willfully, wantonly, recklessly, carelessly, wrongfully and/or intentionally selected particular analytical methods, sampling techniques, and/or data reporting strategies so as to generate false, incomplete and/or misleading C-8 water sampling data results that were artificially low and/or otherwise not accurately representative of the true nature of C-8 levels in the environmental media being analyzed.

133.    Once it knew that C-8 was present in human drinking water supplies near its Washington Works Plant, including levels above its own 1 ppb CEG, DuPont prepared media statements and press releases to disclose and address the C-8 contamination. However, with the knowledge and approval of top corporate management, DuPont then negligently, recklessly, carelessly, wrongfully and/or intentionally withheld that information from the individuals consuming the C-8 contaminated drinking water for, among other reasons, a corporate desire not to negatively impact its corporate profits and/or other economic interests.

134.    By at least the 1980s, DuPont was aware of various technologies that could reduce the amount of C-8 emitted into the air or into water from the Plant, such as scrubbers for plant stacks and carbon absorption water treatment systems. However, despite that knowledge, DuPont negligently, recklessly, carelessly, wrongfully and/or intentionally refused to fully install and/or implement such available technologies for decades for, among other reasons, a corporate desire not to negatively impact its corporate profits and/or other economic interests.

135.    DuPont actively took steps to purposely and/or intentionally conceal from the

public the detection of C-8 in the human drinking water supplies at levels exceeding Defendant's 1 ppb CEG, including purposeful and/or intentional omissions of any reference to such test results when specifically asked about C-8 levels by members of the media or government. DuPont also omitted any such references in a letter co-drafted by DuPont and LPSD, which LPSD then sent to its water customers, dated October 31, 2000.

136.   At all times relevant hereto, DuPont has encouraged the publication and public dissemination by Defendant-employed and/or -funded scientists, employees, agents and/or consultants of toxicity and health data purposefully, intentionally, willfully, wantonly, recklessly and/or negligently designed to inaccurately, artificially and/or misleadingly minimize potential and/or actual negative C-8 human health effects and/or risks, and to discredit and/or otherwise negatively affect those who suggest or state that such potential and/or actual negative C-8 human health effects and/or risks do in fact exist.

137.   At all times relevant hereto, DuPont management repeatedly and consistently rejected the recommendations of its own scientists and outside advisors, including its own in-house epidemiologists, to pursue appropriate investigations of C-8 health effects, failed to maintain appropriate records of those health effects and claims, and refused to allow results showing adverse effects to be documented, published, or accurately and properly disclosed.

138.   At no time since C-8 was first detected in Plaintiff's drinking water have Defendants disclosed to or advised the public, including Plaintiff, that C-8 was or is present in such water at any level presenting a risk of harm or injury.

139.   Since the time that C-8 was first detected in Plaintiff's drinking water, Defendants have knowingly, willfully, wantonly, recklessly, intentionally and consistently misrepresented and/or assisted, coordinated or otherwise encouraged others to misrepresent to the public,

including Plaintiff, that the C-8 present in such water will not cause any harm or injury, or present any meaningfully increased risk of such harm or injury, and has consistently falsely denied that such C-8 water contamination could give rise to any existing or potential personal injury of any kind for anyone drinking any amount of such water.

140.    For several decades, Defendants have known that the discharge of C-8 into the Ohio River from the Plant contributes to the levels of C-8 present in human water supplies. In addition, Defendants knew that the harmful discharge of C-8 could be reduced substantially by use of a carbon absorption treatment system at the Plant.

141.    In Spring of 2001, the West Virginia Division for Environmental Protection (hereinafter referred to as "WVDEP") demanded that DuPont begin monitoring and reporting to WVDEP the levels of C-8 discharged from the Plant into the Ohio River. It was not until after that time that DuPont installed a carbon absorption treatment system at the Plant in order to begin reducing the levels of C-8 discharged directly from the Plant into the Ohio River.

142.    In 2004, DuPont entered into a Class Action Settlement Agreement in the Leach Case, which was subsequently approved by the Court in 2005 following appropriate notice and a fairness hearing (hereinafter referred to as the "*Leach* Settlement").

143.    Prior to being required to do so under the terms of the *Leach* Settlement, DuPont did not at any relevant time offer or provide for, and actively opposed and rebuffed, any treatment or abatement of C-8 levels in any private or public human drinking water supply in Ohio or West Virginia.

144.    Under the *Leach* Settlement, certain individual personal injury, wrongful death and punitive damages claims of the *Leach* Class Members relating to the contamination of their drinking water with C-8 attributable to the Plant (hereinafter referred to as the "Individual Injury

Claims") were stayed and preserved (and all potentially applicable statutes of limitations would continue to be tolled), pending a determination by a new "C-8 Science Panel" jointly selected by DuPont and Plaintiffs' Class Counsel, and funded by Defendant. The C-8 Science Panel was charged with determining whether there is any "Probable Link" between C-8 exposure of the Class Members and any Human Disease(s), as such terms are defined in the Leach Settlement.

145.     The C-8 Science Panel ultimately determined that a "Probable Link" exists between C-8 exposure among *Leach* Class Members and the following human diseases: 1) kidney cancer; 2) testicular cancer; 3) ulcerative colitis; 4) thyroid disease; 5) pregnancy-induced hypertension/preeclampsia; and 6) medically-diagnosed high cholesterol (hereinafter referred to as the "Linked Diseases"). The results and the Linked Diseases are documented by the C-8 Science Panel in a series of reports, the last of which was released in October of 2012.

146.     In December 2011, after the C-8 Science Panel released its "Probable Link Finding" for pregnancy-induced hypertension/preeclampsia, Defendant's Plant Manager represented in a statement released to the media, including the Parkersburg *News & Sentinel*, which DuPont intended be disseminated to the public, including Plaintiff, that DuPont "does not believe that [C-8] causes pregnancy-induced hypertension."

147.     Because the C-8 Science Panel was not required to release to DuPont and the *Leach* Case class members its underlying data package until late in January of 2013, Defendants have agreed that the running of any statute of limitations applicable to *Leach* Class Members' Individual Injury Claims not otherwise released or dismissed under that Settlement will continue to be deemed tolled from August 30, 2001, through January 28, 2013.

148.     Under the *Leach* Settlement, Defendants agreed for the purposes of any Individual Injury Claims of *Leach* Class Members that Defendants will not contest the issue of general

causation (meaning whether it is probable that exposure to C-8 is capable of causing a particular human disease) between C-8 and any Linked Diseases.

149.    *Leach* Class Members are defined under the *Leach* Settlement to include certain individuals who consumed for at least one year prior to December 3, 2004, C-8 contaminated drinking water from one or more drinking water sources specified in that Settlement and who did not opt-out or otherwise waive their rights under that Settlement.

150.    Plaintiff is a *Leach* Class Member and suffers from one or more of the Linked Diseases, including being diagnosed with testicular cancer.

151.    The Releases have made and/or continue to make Plaintiff physically ill and otherwise physically harmed, and/or have caused and continue to cause associated emotional and mental stress, anxiety, and fear of current and future illnesses, including but not limited to, fear of significantly increased risk of cancer and other disease.

152.    The conduct, actions, and omission of Defendants as described in this Complaint were carried out with actual malice and/or with a conscious, reckless, and outrageous indifference to the health, safety, and welfare of Plaintiff and others.

153.    By engaging in the wrongful conduct described hereinabove and, in this Complaint, Defendants engaged in willful misconduct and exhibited an entire want of care that would raise to the level of actual malice and/or a conscious, reckless, and outrageous indifference to the health, safety, and welfare of Plaintiff and others.

154.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs in each Count of this Complaint as is fully set forth therein.

## FIRST CAUSE OF ACTION

### *NEGLIGENCE*

155.    Plaintiff repeats, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

156.    Defendants had a general duty to exercise reasonable care in their ownership, maintenance, management, operation and/or control of the Plant, including a duty to assure that the Plant would not create a nuisance or condition causing any harm, injury or damage to innocent people or the environment.

157.    In addition to its general duty of care, by affirmatively representing that the Releases and Defendants' above detailed acts and/or omissions did not and/or were not causing any physical harm or other damage to Plaintiff, other exposed individuals, and the general public, and that the contaminated drinking water was safe to consume, Defendants also voluntarily assumed a duty to Plaintiff, other exposed individuals, and the general public.

158.    Further, Defendants owed a duty of care towards Plaintiff, other exposed individuals, and the general public commensurate with the inherently dangerous and harmful nature of the substance C-8 and the dangers resulting from exposure to C-8.

159.    Defendants failed to exercise ordinary care in the operation and/or management of the Plant and/or the conduction of operations and activities at the Plant in such a manner as to negligently cause, permit and/or allow the Releases, thereby contaminating the drinking water and blood/body of Plaintiff, and also by knowingly making false representations to and/or knowingly concealing material information from Plaintiff, other exposed individuals, and the general public regarding the Releases, the contaminated drinking water, and Plaintiff's harmful exposure to C-8.

160.    Despite knowing the harmful effects of C-8 exposure and the Releases, and

knowing that the drinking water contaminated with C-8 was unsafe to consume, Defendants, its agents, servants, and/or employees, committed negligent acts and/or omissions including but not limited to the following acts and/or omissions:

> (a)     Failing to properly minimize, abate and/or treat the Releases;
>
> (b)     Failing to properly notify the public or government officials of the ongoing Releases;
>
> (c)     Failing to correct, clarify, rescind and/or qualify its representations to Plaintiff, other exposed individuals, and the general public that the Releases and Defendant's acts and/or omissions were not causing any physical harm and/or damage to them; and
>
> (d)     Failing to correct, clparify, rescind and/or qualify its representations to Plaintiff, other exposed individuals, and the general public that the contaminated drinking water was safe to consume.

161.     Defendants thereby under-reported, underestimated and downplayed the serious dangers of exposure to C-8.

162.     Defendants, being conscious of the Releases, the probable injuries resulting from exposure to C-8, and its negligent acts and/or omissions, consciously, recklessly, and intentionally failed to exercise ordinary care and thereby breached its duty to Plaintiff, other exposed individuals, and the general public.

163.     Defendants knew or should have known that Plaintiff, other exposed individuals, and the general public would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

164.     But for Defendant's negligent acts and/or omissions, Plaintiff would not have consumed and/or been exposed to unhealthy levels of C-8, and/or would not have continued to consume the contaminated drinking water.

165.     Defendant's negligence was the direct and proximate cause of Plaintiff's injuries,

harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

166.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications.

167.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

<u>SECOND CAUSE OF ACTION</u>
*CONCEALMENT, MISREPRESENTATION, AND FRAUD*

168.    Plaintiff repeats, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169.    Defendants negligently, knowingly, intentionally, maliciously, willfully, wantonly, and/or recklessly failed and/or refused to advise Plaintiff, other exposed individuals, and the public at large of the dangers and/or risks to their health posed by the Releases.

170.    Defendants negligently, knowingly, intentionally, maliciously, willfully, wantonly, and/or recklessly withheld, misrepresented and/or concealed information regarding the Releases from Plaintiff, other exposed individuals, and the general public who were entitled to such information that, had it been known, would have prevented them from exposure to the Releases.

171.    Defendants knew or reasonably should have known that the Releases and C-8 had a causal connection with and/or increased the risk of causing harm to exposed individuals, both

human and animal, based on such knowledge as statistically significant findings indicating that exposure to C-8 can cause such damage.

172.    Defendants had a general duty to exercise reasonable care in its ownership, maintenance, management, operation and/or control of the Plant, including a duty to disclose to Plaintiff, other exposed individuals, and the general public actual and potential harm to them resulting from Defendant's acts and/or omissions. This general duty of care included a duty to disclose to Plaintiff, other exposed individuals, and the general public that the Releases had and continued to expose them to dangerous and harmful levels of C-8.

173.    Defendants also voluntarily assumed a duty to disclose to Plaintiff, other exposed individuals, and the general public actual and potential harm to them resulting directly and proximately from Defendant's acts and/or omissions when Defendants affirmatively represented to them that the Releases and C-8 exposure was harmless, despite the fact that Defendants knew or reasonably should have known that the Releases and C-8 exposure have a causal connection to serious bodily injury. This duty included a duty to disclose to Plaintiff, other exposed individuals, and the general public that Defendant's Releases had exposed, and were continuing to expose, them to dangerous and harmful levels of C-8.

174.    Defendants created a relationship of trust and confidence between itself and Plaintiff, other exposed individuals, and the general public through its voluntary acts and/or representations, and its possession of superior knowledge of, responsibility for and/or control over the Releases.

175.    Despite Defendant's knowledge regarding the Releases and C-8 exposure, Defendants breached its duty to disclose information to Plaintiff, other exposed individuals and the general public by negligently, knowingly, intentionally, maliciously, willfully, wantonly,

and/or recklessly withholding, misrepresenting and/or concealing information from them regarding the Releases and C-8 exposure, and did so with the intention to mislead and/or defraud them into continued purchase and consumption of drinking water contaminated with C-8.

176.    Plaintiff justifiably relied upon Defendant's superior knowledge in deciding to purchase and consume the drinking water contaminated with C-8 as Plaintiff did not and could not possess sufficient information to determine the safety of that contaminated drinking water. Therefore, Plaintiff was misled into the belief that the contaminated drinking water was in fact safe to consume by Defendant's false and misleading affirmative misrepresentations and intentional omissions and/or concealment of relevant, significant, and material facts and information, and thereby continued to purchase and consume that contaminated drinking water, which directly and proximately caused harm to Plaintiff as described above.

177.    As earlier indicated, Defendants negligently, knowingly, intentionally, maliciously, willfully, wantonly, and/or recklessly withheld, misrepresented and/or concealed information in its possession regarding extensive research, testing, and lack thereof, and/or studies of human and animal exposure to C-8 that undeniably demonstrated a causal connection between C-8 and an increased risk of damage to both humans and animals, as well as other relevant medical, legal, scientific and/or ethical information to which Plaintiff was entitled prior to making the decision to purchase and consume the contaminated drinking water, and which Defendants had a duty to disclose, as indicated above.

178.    Plaintiff was injured, as alleged above, as a direct and proximate result of the acts and/or omissions detailed herein of Defendant, its agents, employees, conspirators and/or joint ventures, by purchasing and consuming the contaminated drinking water.

179.    In addition to negligently, knowingly, intentionally, maliciously, willfully,

wantonly, and/or recklessly withholding, misrepresenting and/or concealing material information from Plaintiff, other exposed individuals and the general public, Defendants also committed fraud against them by affirmatively representing to Plaintiff, other exposed individuals and the general public that the Releases and exposure to C-8 were harmless and/or presented no risk of harm when Defendants knew or reasonably should have known, and with utter disregard and recklessness as to whether such representations were in fact accurate, that the Releases and exposure to C-8 had and were continuing to cause injury to both animals and humans, including Plaintiff, and/or an increased risk of such injury. Therefore, Defendants negligently, knowingly, intentionally, maliciously, willfully, wantonly, and/or recklessly made false representations to Plaintiff, other exposed individuals, and the general public.

180.    As such, Defendants voluntarily assumed a continuous duty of care to provide Plaintiff, other exposed individuals, and the general public with truthful representations regarding any actual and/or potential harm resulting directly and proximately from Defendant's acts and/or omissions.

181.    Defendants did not exercise ordinary care in affirmatively making false representations and/or omissions to Plaintiff, other exposed individuals, and the general public, in that those individuals relied upon and based their belief on such representations and/or omissions that the contaminated drinking water was safe to purchase and consume, continued to do so, and thereby did not seek medical treatment and/or remedies for their past and continued harmful exposure to C-8.

182.    Furthermore, Defendants affirmatively made such false representations and/or omissions to Plaintiff, other exposed individuals, and the general public with the intention of misleading them into such reliance. Due to Defendant's superior knowledge regarding the Releases

and exposure to C-8, that reliance was therefore justifiable.

183.   As a direct and proximate result of their justified reliance on Defendants' affirmative and fraudulent representations and/or omissions, Plaintiff, other exposed individuals, and the general public continued to purchase and consume the contaminated drinking water, and thereby suffered damage and injury as alleged herein. Specifically, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications.

184.   As a direct and proximate result of the foregoing acts, representations and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

## THIRD CAUSE OF ACTION
### *CONSPIRACY AND STRICT LIABILITY*

185.   Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

186.   Defendants maliciously conspired with independent testing organizations, agencies, laboratories and/or water companies to conduct acts and/or omissions including but not limited to the following:

(a)   Illegally and/or wrongfully operating and/or managing the Plant and/or conducting other operations and activities at the Plant in such a manner as to illegally and/or wrongfully cause, permit and/or allow the Releases that

contaminated the drinking water and thereby the blood/body of Plaintiff.

(b)    Making unlawful and affirmative misrepresentations and/or unlawfully concealing material facts regarding the Releases, C-8 exposure, and the contamination of drinking water.

(c)    Knowingly making illegal and/or wrongful false representations and/or knowingly concealing material information from Plaintiff, other exposed individuals and the general public regarding the Releases, C-8 exposure, and the contamination of drinking water.

(d)    Illegally and/or wrongfully avoid minimization, abatement and/or treatment of the Releases.

(e)    Illegally and/or wrongfully avoiding proper notification to the public and/or government officials regarding the ongoing Releases.

(f)    Illegally and/or wrongfully avoiding correcting, clarifying, rescinding and/or qualifying its misrepresentations to Plaintiff, other exposed individuals, and the general public that the Releases and its acts and/or omissions were not causing any physical harm and/or damage to them, or that the contaminated drinking water was safe to purchase and consume.

187.    Through the above detailed conspiratorial acts and/or omissions, Defendants and their conspirators wrongfully and/or unlawfully hid Defendants' unlawful Releases, with the purpose of wrongfully and/or unlawfully deceiving Plaintiff, other exposed individuals, and the general public into purchasing and consuming the drinking water knowingly contaminated by C¬8, and/or to avoid any potential lost profits and other economic harm or loss to Defendants.

188.    The above-detailed conspiracy, in addition to further unlawful actions by Defendants' and their co-conspirators, including affirmative misrepresentations as to the safety of the contaminated drinking water, violated West Virginia and federal law, including but not limited to West Virginia's Consumer Credit and Protection Act, W. Va. Code §§ 22-11-1 *et seq.*, and 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e.

189.    The conspiracy and wrongful and/or unlawful acts, misrepresentations and/or omissions of Defendants and their co-conspirators directly and proximately caused Plaintiff to justifiably rely on such acts and/or misrepresentations, thereby directly and proximately causing the injury to Plaintiff and resulting damages detailed herein.

190.    At all relevant times in making such misrepresentations, Defendants and their co-conspirators knew that the contaminated drinking water contained unhealthy and dangerous levels of C-8, and that drinking such contaminated drinking water would result in injury to the consumer.

191.    At all relevant times in making such misrepresentations, Defendants were aware of the high probability that serious harm would result from the above-detailed misconduct of it and its co-conspirators.

192.    At all relevant times in making such misrepresentations, Defendants profited hundreds of millions of dollars from that misconduct of it and its co-conspirators. Defendants remains in good financial standing.

193.    Furthermore, Defendants made absolutely no effort to disclose and/or remedy the C-8 pollution even after the above-detailed misconduct had been discovered.

194.    The Releases and above-detailed acts and/or omissions of Defendants constitute abnormally dangerous activities in that they caused a highly increased risk of great harm to Plaintiff, other exposed individuals and the general public, in addition to the extent to which the Releases, acts and/or omissions of Defendants and their use of C-8 were not common activities or uses, the inappropriateness of carrying on the Releases and Defendant's acts and/or omissions to that area and its inhabitants, and the extent to which the danger of the Releases and Defendant's acts and/or omissions vastly outweighs the value to the community.

195.    The harm and injury suffered by Plaintiff as a direct and proximate result of

Defendants' acts and/or omissions was the type of harm that makes Defendants' acts and/or omissions abnormally dangerous.

196.    Therefore, Defendants are strictly liable to Plaintiff for the injuries and damages which Plaintiff suffered that were the direct and proximate result of the Releases and Defendant's acts and/or omissions.

197.    As a direct and proximate result of the Releases and the above-detailed acts and/or omissions, Plaintiff suffered damage and injury as alleged herein. Specifically, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications.

198.    As a direct and proximate result of the foregoing acts, representations and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

<u>**FOURTH CAUSE OF ACTION**</u>

***STRICT LIABILITY: DEFECTIVE PRODUCT AND FAILURE TO WARN***

199.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

200.    Defendants actively conspired to distribute the contaminated drinking water in an unreasonably dangerous and defective condition and permitted the contaminated drinking water to be placed in the stream of commerce knowing it would be ingested by humans, including Plaintiff,

44

other exposed individuals, and the public at large.

201.    The contaminated drinking water was defective in that, when it was placed in the stream of commerce: (1) the foreseeable risks exceeded the benefits associated with consumption (2) the contaminated drinking water was more dangerous than the ordinary consumer, including Plaintiff, other exposed individuals, and the public at large, would expect and more dangerous than other drinking water that was available and marketed in the area; (3) the contaminated drinking water was not distributed with sufficient warnings and instructions associated with its use; and (4) the contaminated drinking water was inadequately tested.

202.    The contaminated drinking water was defective in that, as distributed and sold, it was not accompanied by proper warnings and instructions.

203.    As a direct and proximate result of the defective condition of the contaminated drinking water, Plaintiff has been injured and damaged as set forth herein.

## FIFTH CAUSE OF ACTION
### *NEGLIGENCE PER SE* AND *PRIMA FACIE* NEGLIGENCE

204.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

205.    West Virginia states, including but not limited to, West Virginia Code Section 22-11-1 *et seq.*, and one or more federal statutes, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e, impose certain duties of care on Defendants in regard to their acts and/or omissions towards Plaintiff and/or Plaintiff's safety.

206.    By performing acts and/or omissions that resulted in the Releases, Defendants thereby violated, and continued to violate, and/or breach those applicable West Virginia and/or

federal statues imposing such duties, including but not limited to West Virginia Code Section 22-11-1 *et seq.*, 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e, constituting negligence *per se* and/or *prima facie* negligence, including liability for all injuries to Plaintiff associated with the Releases.

207.    Defendants' violation of law and breach of its statutory duties directly and proximately caused and/or continues to directly and proximately cause damage to Plaintiff for which Defendants are liable.

208.    As a direct and proximate result of Defendants' violation of law and breach of their statutory duties, including but not limited to those listed above, Plaintiff suffered economic and physical damage and injury as alleged herein for which Defendants are therefore liable. Specifically, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications.

209.    As a direct and proximate result of the foregoing acts, representations and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

### SIXTH CAUSE OF ACTION
#### *PAST AND CONTINUING TRESPASS AND BATTERY*

210.    Plaintiff repeats, reiterates, and reallege, each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

211.    At all relevant times, Defendants possessed knowledge that the Releases were contaminating active sources of drinking water, including that of Plaintiff, with harmful levels of C-8, which it knew to be toxic to humans and animals and would remain in the blood and/or body of an exposed individual for an unacceptably long period of time.

212.    However, despite possessing such knowledge, Defendants continued, and continue, to cause Releases resulting in C-8 contamination of active drinking water sources, including that of Plaintiff, which cause harmful physical contact with Plaintiff, other exposed individuals, and the general public.

213.    Therefore, Defendants clearly demonstrated intent and/or reckless indifference with regard to the Releases and the harm they caused and will cause by continuing to perform the above detailed acts and/or omissions despite possessing knowledge that such actions would result in harmful physical contact with Plaintiff, other exposed individuals, and the general public.

214.    These intentional acts and/or omissions by Defendants have resulted in the Releases, and the continued threat of release of C-8, onto and/or into the blood and/or body of Plaintiff. That contact and the otherwise unlawful and harmful invasion, contact and/or presence of C-8 onto and/or into Plaintiff's blood and/or body interfere with Plaintiff's rightful use and possession of Plaintiff's blood and/or body.

215.    At all relevant times, the C-8 present in and/or on Plaintiff's blood and/or body originated from the Plant and is therefore the property of Defendants.

216.    The above-detailed invasion of C-8 in and/or on Plaintiff's blood and/or body was and continues to be unconsented and without permission or authority from Plaintiff or anyone authorized to grant such permission, and continues to be so.

217.    Defendants acted intentionally with the knowledge and/or belief that the contact,

presence and/or invasion of C-8 with, onto and/or into Plaintiff's blood and/or body were substantially certain to result from those very acts and/or omissions.

218.    Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's blood and/or body.

219.    The continued presence of C-8 in and/or on Plaintiff's blood and/or body is offensive, unreasonable and/or harmful, and thereby constitutes a continuing and/or permanent trespass and battery.

220.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered economic and physical damage and injury as alleged herein for which Defendants are therefore liable. Specifically, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications, and fear of redeveloping cancer.

221.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

## SEVENTH CAUSE OF ACTION
### *NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

222.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

223.    Defendants' acts and/or omissions, including continuing to pollute the environment

and subsequently exposing Plaintiff, other exposed individuals, and the general public to dangerous and harmful levels of C-8, despite its knowledge of a causal link between such exposure and probable harm and/or unacceptable risk of harm to exposed individuals, were negligent, intentional and/or reckless.

224.     Defendants negligently, knowingly, intentionally, maliciously, willfully, wantonly, and/or recklessly withheld and concealed material information from Plaintiff, other exposed individuals, and the general public that they were being exposed to harmful levels of C-8.

225.     Defendants also affirmatively misrepresented to Plaintiff, other exposed individuals, and the general public that the Releases and C-8 were not and would not cause or create any increased risk of harm to them, despite possessing knowledge at the time of making such misrepresentations that the Releases and C-8 exposure in general was causing and would continue to cause harm and/or increased risk of harm to exposed individuals, including Plaintiff.

226.     At all relevant times, it was foreseeable, and Defendants were certain and/or substantially certain, that its acts and/or omissions would cause emotional distress to Plaintiff, other exposed individuals, and the general public.

227.     Defendants' acts/and or omissions were extreme, outrageous, intolerable and/or offended the generally accepted standards of decency and morality.

228.     Defendants' long-term, repeated, and immoral actions and/or omissions are strong evidence that Plaintiff's severe emotional distress is and was justified.

229.     Defendants acted in an extreme, outrageous and intolerable manner which offended the generally accepted standards of decency and morality by continuing to expose Plaintiff, other exposed individuals and the general public to the Releases and harmful levels of C-8, continuing to affirmatively misrepresent to such individuals that the Releases and C-8 exposure were not and

would not cause harm or increased risk of harm to them, and/or continuing to withhold and/or conceal from Plaintiff, other exposed individuals and the general public material information on such issues, despite possessing knowledge that the Releases and C-8 exposure had caused and would continue to cause harm and/or increased risk of harm to exposed individuals.

230.    As a direct and proximate result of the Defendants' acts and/or omissions, and concealment and/or affirmative misrepresentations, Plaintiff suffered economic and physical damage and injury as alleged herein for which Defendants are therefore liable. Specifically, Plaintiff was caused to suffer serious and dangerous injuries, including testicular cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment and/or medications, and fear of redeveloping cancer.

231.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

## EIGHTH CAUSE OF ACTION

### *UNFAIR AND DECEPTIVE PRACTICES (W. VA. CODE §§ 46A-6-101, 102)*

232.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

233.    In October and November of 2000 and July of 2001, Defendants co-drafted, aided in publishing, and encouraged dissemination and circulation of written information through correspondence to the public exposed to known C-8 contaminates and did induce, directly and indirectly, West Virginia residents, including Plaintiff, other exposed individuals, and the public

at large, to enter into contracts and agreements to purchase and/or continue purchasing the drinking water, and to in fact purchase such drinking water when the published information was known and calculated by the DuPont to mislead Plaintiff, other exposed individuals, and the public at large in West Virginia.

234.     Because Defendants actively advertised the contaminated drinking water, Defendants were engaged in "trade" and/or "commerce" under West Virginia law.

235.     As a purchaser and user of the contaminated water, Plaintiff was a "consumer" under West Virginia law, and Plaintiff's purchase and consumption was a "consumer transaction" under West Virginia law.

236.     Defendants, through the publication of incomplete and false information regarding the safety of the drinking water, engaged in and aided in unfair methods of competition and unfair or deceptive practices as set forth in W. Va. Code § 46A-6-102(7)(L) and (N), including, but not limited to: advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast, a statement or representation with regard to the sale of goods which was false, misleading, or deceptive, and/or which omitted to state material information which was necessary to make the statements made therein not false, misleading or deceptive and also by engaging in conduct which created a likelihood of confusion or of misunderstanding.

237.     Defendants also engaged in unfair methods of competition and unfair or deceptive practices by advertising the contaminated drinking water in such a manner as to: cause confusion and/or misunderstanding as to the source, sponsorship, approval or certification of the contaminated drinking water; cause confusion and/or misunderstanding as to the affiliation, connect, or association with or certification by another of the contaminated drinking water; using

deceptive representations in connection with the contaminated drinking water; representing that the contaminated drinking water had sponsorship, approval, characteristics, ingredients, uses, benefits and/or quantities that it did not have; representing that the contaminated drinking water was of a particular standard, quality, and/or grade when the contaminated drinking water was not of such standard, quality, and/or grade; advertising the contaminated drinking water as being safe to consume with the intent that the contaminated drinking water would be sold in its unsafe condition and not as advertised; engaging in conduct which created confusion and/or misunderstanding as to the contaminated drinking water; acting and using deception, fraud, false pretense, false promise/misrepresentation, and/or concealing, suppressing, and/or omitting material facts with the intent that Plaintiff-decedent, other exposed individuals, and the general public would rely upon such concealment, suppression, and/or omission in connection with the sale and advertisement of the contaminated drinking water.

238.    The acts and omissions described above violated W. Va. Code § 46A-6-101, *et seq.* in that Defendants misrepresented and withheld information about the deleterious effects of the Materials with the intent that Plaintiff, other exposed individuals, and the public at large purchase and consume contaminated drinking water when Defendants knew if the truth were published or provided to Plaintiff, other exposed individuals, and the public at large that they would not purchase or consume the contaminated drinking water.

239.    Defendants' affirmative misrepresentations in its advertisements violated W.Va. Code § 46A-6-101, et seq., in that Defendants made such misrepresentations about the supposed safety of the contaminated drinking water with the intent that Plaintiff-decedent, other exposed individuals, and the public at large would purchase and consume the contaminated drinking water when Defendants knew if the truth were published or provided to Plaintiff, other exposed

individuals, and the public at large, that they would not purchase or consume the contaminated drinking water. As a proximate result of the violation by Defendants of W. Va. Code § 46A-6-101, *et seq*., Plaintiff, other exposed individuals, and the public at large suffered an ascertainable loss of money or property, and he is entitled to recover damages as provided by such statute.

240.    Defendants' unfair methods of competition and unfair and deceptive acts and practices in the conduct of the trade and commerce of the contaminated drinking water were "unlawful" under West Virginia Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Thomas Matheny requests the Court to enter judgment in his favor against Defendants E. I. du Pont de Nemours and Company and The Chemours Company, awarding all such relief as the Court deems appropriate and just, including:

(a)   An amount of compensatory damages determined by a judge and/or jury according to the laws of the State of West Virginia;

(b)   An amount of punitive damages determined by a judge and/or jury according to the laws of the State of West Virginia;

(c)   Pre-judgment and post-judgment interest as provided under the law;

(d)   Costs and attorney fees expended in the prosecution of this matter; and

(e)   Any and all further relief as a court and/or jury deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

**DATED**: August 4, 2022

Respectfully submitted,

**THOMAS MATHENY, *Plaintiff*,**

By:    */s/ Clayton J. Fitzsimmons*
        Clayton J. Fitzsimmons (WV Bar # 10823)
        Robert P. Fitzsimmons (WV Bar # 1212)
        Mark A. Colantonio (WV Bar #4238)
        **FITZSIMMONS LAW FIRM PLLC**
        1609 Warwood Avenue
        Wheeling, WV 26003
        Telephone: (304) 277-1700
        Fax: (304) 277-1705
        clayton@fitzsimmonsfirm.com
        bob@fitzsimmonsfirm.com
        mark@fitzsimmonsfirm.com

        */s/ Paul T. Farrell, Jr.*
        Paul T. Farrell, Jr. (WV Bar # 7443)
        Michael J. Fuller, Jr. (WV Bar # 10150)
        **FARRELL & FULLER, LLC**
        1311 Ponce De Leon, Suite 202
        Santurce, PR 00907
        Telephone: (939) 293-8244
        Fax: (939) 293-8245
        paul@farrellfuller.com
        mike@farrellfuller.com